IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SCOTT N. STERNER, SR. and | : | CIVIL ACTION |
| RAYMOND W. AUSTIN, | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| COUNTY OF BERKS, | : | No. 13-1568 |
| PENNSYLVANIA, et. al, | : | |
| Defendants. | : | |

**MEMORANDUM OPINION**

**Timothy R. Rice**                                                                                  **March 28, 2014**
**U.S. Magistrate Judge**

Plaintiffs Scott N. Sterner, Sr. and Raymond W. Austin assert the following claims against Defendants County of Berks and Berks' Controller Sandra Graffius (collectively "Berks"): (1) Sterner asserts violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII") and the Pennsylvania Human Relations Act ("PHRA") due to sexual harassment and retaliation; (2) Austin claims violations of Title VII and PHRA for retaliation; and (3) Sterner and Austin bring separate claims under Pennsylvania state law for intentional infliction of emotional distress. Berks seeks summary judgment on Sterner's and Austin's claims.

Berks' motion is granted in part. No reasonable jury could find that Sterner was subject to a sexually hostile work environment that was severe or pervasive. Sterner and Austin also failed to produce any medical evidence or expert reports to support their emotional distress claims. They both, however, raise genuine issues of material fact concerning Sterner's and Austin's retaliation claims. Berks' motion is denied as to those claims.

## I. Legal Standard

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." Id.

Where there is only one reasonable conclusion from the record regarding the potential verdict under the governing law, summary judgment must be awarded to the moving party. See id. at 250. "If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." Id. at 250-51. I must view the facts and any inferences from those facts in the light most favorable to the non-moving party. See Ray v. Warren, 626 F.3d 170, 173 (3d Cir. 2010).

## II. Facts[1]

### A. Sterner

Sterner worked as Berks' Auditor Manager. Berks' Facts (doc. 32-2) at ¶ 1-3. Graffius is Berks' elected Controller. Id. at ¶ 5. On July 6 and 7, 2010, Sterner complained to Jennifer

---

[1] Plaintiffs cite their bate-stamped record. I will cite Berks' exhibits, which are docketed and clearly identified, with the exception to some documents which Plaintiffs have provided.

Plaintiffs also attached an affidavit from Sterner. See Pls.' Ex. J, Sterner's Aff. Berks objects to its consideration because it is a "sham affidavit." Berks' Reply (doc. 35) at 2, 3 n.2; see Jimenez v. All Am. Rathskeller, Inc., 502 F.3d 247, 251 (3d Cir. 2007) (party cannot create material issue and defeat summary judgment by disputing his sworn testimony without demonstrating a plausible explanation of conflict in an affidavit) (quotation and citation omitted)); id. at 253 ("sham affidavit" is one offered solely to defeat summary judgment that court concludes no reasonable jury could afford evidentiary weight).

Because all of the pertinent facts necessary for ruling on Berks' motion for summary judgment are found in Sterner's deposition, I did not consider his affidavit.

2

Biehn from Human Resources ("HR") that Graffius called him "cutie" and/or "sweetie," referred to someone as his "butt-buddy" or "asshole buddy," talked about online dating sites, and sent inappropriate emails (the "Emails") to the Controller's email group.[2]  Id. at ¶¶ 47-50, 65, 95; Pls.' Facts (doc. 33-2) at ¶¶ 1, 4; Berks' Ex. T, Sterner's Dep. at 254-62; Pls.' DEF 936, 938.

Graffius sent four or five Emails from 2006 to 2010, featuring: (1) a January 26, 2006 joke[3] about two little old ladies in a used car; (2) a December 22, 2009 joke about a guy at a bar and the bartender licking a woman's chest; (3) a January 7, 2010 joke containing several "Maxine"[4] cartoons and statements relating to, among other things, "old ladies," their husbands, and aging; (4) an April 1, 2010 joke about "flashers," containing pictures of the naked backsides of men; and (5) a May 26, 2010 joke stating "why [do] they use women for calendars" and containing pictures of some naked, overweight men, and others in bathing suits.[5]  Pls.' Facts at ¶¶ 2, 3; Berks' Facts ¶¶ 49-54, 57, 60; Berks' Ex. C, Emails.  Sterner did not complain to HR about the Emails at the time he received them.  Rather, he forwarded them to his home email address.  Berks' Facts ¶¶ 53-56, 59, 61.  In addition to the Emails, Sterner told Biehn about Graffius' "hugging and kissing" other employees.  Pls.' DEF 938.

---

[2]   Berks objects to Plaintiffs' reliance on HR's notes, contending that they are inadmissible double hearsay.  See Berks' Reply at 2 n.1; Fed. R. Evid. 801.  Sterner, however, does not need to rely on the HR notes if he testifies at trial about his meetings with Berks' HR department.  See Fed. R. Evid. 801(d)(2)(D) (party opponent's statements made by agent).  Moreover, any notes referencing Sterner's own statements would be admissible at trial as non-hearsay, i.e. prior consistent statements, if Sterner can satisfy Federal Rule of Evidence 801(d)(1)(B), or non-hearsay to show the content of Berks' agent's statements.

[3]   Both parties have described the emails as "jokes."

[4]   Maxine is an older woman in a Hallmark cartoon that usually features a captioned joke.

[5]   There is also an October 5, 2008 Dr. Seuss Email included in Berks' exhibit, but that email was not sent by Graffius.  Sterner's Dep. at 293-95.

During a July 15, 2010 meeting with Sterner and Biehn, Graffius apologized to Sterner for sending the emails and pledged it would not happen again. Id. at 941; Berks' Facts at ¶¶ 65-66; Sterner's Dep. at 261-62. She explained that she would strive to avoid public displays of affection, such as hugging other employees. Pls.' DEF 941. Graffius later said that, other than Sterner, no one spoke to her about her emailed attempted humor. Berks' Facts at ¶ 79. Graffius also explained that she called people "cutie" or "sweetie" when she forgot someone's name. Id. at ¶ 94. Biehn asked Sterner to give her an update in a couple of months on the situation. Id. at ¶ 97; Pls.' Facts ¶ 64; Sterner's Dep. at 370-71.

Shortly after the July 15, 2010 meeting, Sterner claims his job duties changed and he was directed to complete additional work. Berks' Facts at ¶ 105; Sterner's Dep. at 324. Sterner asserts his access to Graffius' calendar was removed, and he was moved from a private office to a cubical. Sterner's Dep. at 342, 349. The auditing department's duties and privileges also changed, including requiring Sterner and others to: sign in and out of their computers every day, take a full hour for lunch, and discontinue flex scheduling privileges. Sterner's Dep. at 365; Berks' Facts at ¶¶ 115-17.

On October 5, 2010, Sterner met with an HR employee, Jennifer Battinger, and told her that "not much changed" regarding his complaints. Sterner's Dep. at 370-71. He explained that, although Graffius was no longer sending the "dirty emails," she continued to call him "cutie" and "sweetie" when they were alone. Id.; Berks' Facts at ¶¶ 65, 98; Pls.' DEF 959. Sterner said Graffius had told the other managers that Sterner had filed a sexual harassment complaint against her, and she was no longer going to hug anyone, except for Shana Simpson, the Controller's Accounting Department Supervisor. Pls.' DEF 956. Sterner also complained that Graffius took

4

away his access to her calendar and had told another employee that Sterner and Nelson, another Berks' employee, were "butt-buddies." Id.

On October 13, 2010, Battinger reprimanded Graffius for publicly disclosing Sterner's HR complaint. Id. at 962. Battinger said, "it makes it seem like [Graffius] is trying to reliate [sic] against Scott [Sterner]." Id. Graffius explained that she told her managers that Sterner went to HR because she was glad he complained. Id. She said she had removed Sterner's access to her calendar because he does not need to see it or schedule her appointments. Id. at 962-63. Graffius also denied calling Sterner and Nelson "butt buddies." Id. at 963. Graffius mentioned her concerns about Sterner's job performance and Battinger offered to arrange and attend Sterner's upcoming performance evaluation. Id. at 963-65.

On October 20, 2010, Battinger told Sterner about her meeting with Graffius and the upcoming meeting to address his performance. Id. at 971. Sterner was offended Graffius suddenly had complaints about his performance. Id. He also claims he thought the upcoming meeting would address only his complaints about Graffius. During a November 3, 2010 meeting, however, Sterner, Battinger, and Graffius discussed Sterner's job performance. Id. at 973-84; Sterner's Dep. at 372-73; Berks' Facts at ¶¶ 99-102.

On December 12, 2010, Sterner filed his first EEOC and PHRA charge against Berks, alleging retaliation for his sexual harassment complaints to HR. Berks' Facts at ¶ 102; Berks' Ex. B, Sterner's 1st Charge; Pls.' Facts at ¶ 166.

On July 27, 2011, Joanne Lumis, another Berks employee, overheard Sterner tell Austin that he did not need to smuggle a gun into work because he could borrow a detective's weapon. Berks' Facts at ¶¶ 119, 125. Lumis notified Graffius, who informed HR. Id. at ¶¶ 119, 129. On July 28, 2011, Sterner and Austin were sent home on two weeks paid administrative leave,

5

pending an internal investigation. Id. at ¶¶ 126, 131, 208. Sterner explained to HR that he had jokingly asked a detective to borrow his gun to shoot a co-worker. Id. at ¶¶ 139-41, 146. He then relayed the joke to Austin, and Lumis had overheard that conversation. Id. at ¶ 141.

After an investigation and meeting with HR, Graffius fired Sterner on August 15, 2011. Id. at ¶¶ 148,162; Pls.' Facts at ¶ 274; Berks' Ex. D, Sterner's Term. Letter. On November 15, 2011, Sterner filed his second EEOC and PHRA charge against Berks for retaliation. Berks' Facts at ¶ 163; Berks' Ex. E, Sterner's 2nd Charge.

B. Austin

Austin worked as Berks' Senior Government Accountant in the Controller's office. Berks' Facts at ¶ 4. He also received Graffius' Emails and thought some of the pictures were filthy. Id. at ¶ 80; Pls.' Facts at ¶ 319. Graffius additionally called Austin "cutie" and/or "sweetie." Berks' Facts at ¶ 91; Pls.' Facts at ¶ 318; Berks' Ex. U, Austin's Dep. at 171. Austin, however, never reported any of the Emails or Graffius' comments to HR. Berks' Facts at ¶¶ 81-82, 91; Pls.' Facts at ¶ 318.

Instead, Austin had complained to HR regarding his exclusion from staff meetings, his treatment by co-workers, his belief that he was being asked to do more work than others, and that he was being treated unfairly, particularly by Graffius. Berks' Facts at ¶¶ 165-68, 183.

On June 10, 2011, Austin was given a "Last Chance Agreement," based on unrelated misconduct, and put on a 10-day suspension.[6] Id. at ¶¶ 186-89; Berks' Ex. F, Last Ch. Agreem.

---

[6]   In May 2010, a female co-worker complained that Austin put his hand on her knee. Berks' Facts at ¶ 170. On May 6, 2011, Austin pushed a female vendor's head towards a counter top. Id. at ¶ 190. On May 8 and 9, 2011, he sent management and co-workers an email questioning the exclusion of a co-worker from working a mandatory Saturday and at-home work arrangements. Id. at ¶¶ 191-92. On May 20, 2011, he punched his fist into his other hand, making a threating gesture towards another employee. Id. at ¶ 194.

The Agreement stated that another violation of Berks' policies and procedures would result in Austin's immediate termination. Berks' Facts at ¶ 195.

While the Last Chance Agreement was in place, and during his paid leave concerning his July 27, 2011 conversation with Sterner, HR investigated another incident involving Austin, in which he allegedly commented about shooting the copier repairman. Id. at ¶¶ 208-29. Graffius terminated Austin on August 5, 2011 for violating his Last Chance Agreement. Id. at ¶¶ 221-23; Berks' Ex. G, Austin's Term. Letter. Austin filed an EEOC and PHRA charge, claiming Sterner and Shana Simpson had filed complaints against Berks and that he was targeted because of his friendship with them.[7] Berks' Ex. H, Austin's Charge. Austin also claims Battinger told him he was fired because Sterner had filed an EEOC complaint. Austin's Dep. at 306.

### III. Discussion

#### A. Sterner's Sexual Harassment/Hostile Work Environment Claim

Berks argues summary judgment should be granted because Sterner was not sexually harassed or subject to a hostile work environment.[8] Berks' Br. at 6-12.

Title VII is violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Oncale v. Sundowner

---

[7] Simpson received Graffius' emails containing the jokes and pictures, but was not upset by them. Berks' Facts at ¶¶ 85-87. She remembered Graffius calling everyone "cutie pie" or "sweetie" because she used a lot of terms of endearment. Id. at ¶ 93. After Simpson was fired, she also filed an EEOC charge. Pls.' Br. (doc. 33-1) at 19; Pls.' Facts at ¶¶ 211, 224 ("Shana Simpson believes she was terminated because she was a friend of Scott Sterner's and because Graffius knew it and Graffius had the notice of Sterner's filing of his EEOC Complaint against Graffius in her hand . . . ."); Berks' Br. (doc. 32-1) at 26. Simpson's charge was resolved with Berks.

[8] Because I find Sterner's hostile work environment claim fails, I need not address Berks' alternative argument that Sterner failed to exhaust his administrative remedies as to his sexual harassment/hostile work environment claim. Berks' Br. at 4-5.

Offshore Serv., Inc., 523 U.S. 75, 78 (1998) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). To establish a hostile work environment claim, Sterner must prove: (1) he suffered intentional discrimination because of his sex; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected him; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) the existence of respondeat superior liability. Mandel v. M & Q Packaging Corp., 706 F.3d 157, 167 (3d Cir. 2013) (citing Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006), overruled on other grounds).

To determine whether conduct is "severe" or "pervasive," I must assess the totality of circumstances to determine "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200, 205 (3d Cir. 2001) (quoting Harris, 510 U.S. at 23). The conduct must "go beyond 'simple teasing, offhand comments, and [non-serious] isolated incidents,'" which would "'not amount to discriminatory changes in the terms and conditions of employment.'" Abramson v. William Paterson Coll. of N.J., 260 F.3d 265, 280 (3d Cir. 2001) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)).

"[S]exual derogatory, or insulting statements [are] actionable when they are made on a very frequent and continuous, for example weekly, basis." Obergantschnig v. Saw Creek Estates Cmty. Ass'n, Inc., No. 12-5911, 2013 WL 5676328, at *6 (E.D. Pa. Oct. 18, 2013) (collecting cases). "[S]tatements or rumors made in isolated incidents over a period of time[,]" however, "are not actionable." Id. at *7 (collecting cases).

Sterner alleges a few isolated incidents, which, even when considered together, were not "severe" or "pervasive." He cites four or five Emails sent over four years. See Saidu-Kamara v.

Parkway Corp., 155 F. Supp. 2d 436, 439-40 (E.D. Pa. 2001) (four incidents over 18 months, including evidence that harasser touched plaintiff's breast, "told her she looked 'fresh,' and propositioned her to join him later that evening," was not severe and pervasive).  Sterner claims that Graffius continued to call him "cutie" and/or "sweetie" even after he complained, but he could recall only two occasions.  See Sterner's Dep. at 252, 256-57, 370-71.  Even assuming the term "butt-buddy" is a sexually derogatory comment, Graffius said it only twice.  See Small v. KS Engineers PC, No. 08-3458, 2010 WL 1705002, at *3 (D.N.J. Apr. 26, 2010) ("Even if assuming a factfinder could consider the incidents in question sexual in nature, one incident with G.P. and several incidents over five to six months with Mr. Langevine cannot be reasonably considered either pervasive or a hindrance [to] work performance.").  These sporadic emails and comments also were not physically threatening.

     Such conduct fails to constitute the type of severe and pervasive harassment that would preclude summary judgment.  Compare Andrews v. City of Phila., 895 F.2d 1469, 1472-74, 1482 (3d Cir. 1990) (hostile work environment claim where pornography was displayed, sexist slurs used, property vandalized, and anonymous threatening phone calls made); Harlet v. McCoach, 928 F. Supp. 533, 539 (E.D. Pa. 1996) (hostile work environment an issue of fact where employees "openly displayed pornographic magazines, wore tee-shirts depicting sexually explicit messages, simulated various sexual acts in the workplace, intentionally passed gas in [plaintiff's] presence, and spread rumors concerning sexual liaisons") with Clayton v. City of Atlantic City, 538 F. App'x 124, 129 (2013) (disciplinary action, "alleged lewd remarks on the radio," and "incident where Mooney grabbed Clayton's buttocks in public and commented that it was 'the only thing she has going for her[,]'" were not severe or pervasive); Sanchez v. SunGard Availability Serv., LP, 362 F. App'x 283, 287 (3d Cir. 2010) (several derogatory comments

9

related to plaintiff's nationality over six years, with three racially-charged emails, did not interfere with plaintiff's ability to do work, thus not a hostile work environment); Martinez v. Rapidigm, Inc., 290 F. App'x 521, 524-25 (3d Cir. 2008) (berated on the telephone for 20 minutes and asked if she thought she was "the Queen," not being initially invited to a conference, overheard sexual comments about another female at a Christmas party, and other similar comments were not severe or pervasive).

Sterner argues that Graffius' conduct would easily meet Berks' HR manual definition of sexual harassment and Biehn stated that she found the emails to be sexual harassment. Pls.' Br. at 8. The issue, however, is whether Sterner can establish a prima facie case of sexual harassment, which requires that the contested conduct was severe or pervasive. Sterner cannot satisfy that burden.

In addition, although Sterner claims that he subjectively perceived his work environment as hostile, a few isolated Emails and comments over four years would not have been detrimental to a reasonable person. See Mandel, 706 F.3d at 167. Sterner claims that one Email caused "disruption" at work, but fails to cite any testimony describing such interference. Rather he cites only the Email itself. See Pls.' Br. at ¶ 2; see also Benny v. Pa. Dep't of Corr., State Corr. Inst. at Somerset, 211 F. App'x 96, 97 (3d Cir. 2006) ("The sporadic incidents of sexually inappropriate language that plaintiff alleges do not comprise an objectively hostile work environment."). Berks' motion for summary judgment on Sterner's sexual harassment/hostile work environment claim is granted.[9]

---

[9] Graffius' emails, her references to Sterner as "cutie" or "sweetie," and the "butt-buddy" type comments are undisputed. Although Sterner now claims that Graffius also talked to him about internet dating, see Pls.' Br. at 8-10, the HR notes state that Sterner reported only that he overheard Graffius talking about those sites, see Pls.' DEF 937. Berks did not address the internet sites. Even if the online dating statements were made to Sterner, considering the

B.  Retaliation

Berks argues that neither Sterner, nor Austin, can establish a retaliation claim. Berks' Br. at 12-32.

A plaintiff asserting a Title VII retaliation claim must prove a prima facie case by showing: (1) he engaged in a protected activity; (2) an adverse employment action; and (3) a causal connection between those two elements. Moore v. City of Phila., 461 F.3d 331, 340-41 (3d Cir. 2006). "Title VII protects those who participate in certain Title VII proceedings . . . and those who oppose discrimination made unlawful by Title VII[.]" Id. at 341 (citation omitted). "[T]he employee must hold an objectively reasonable belief, in good faith, that the activity they oppose is unlawful under Title VII." Id. (citing Clark Cnty. v. Breeden, 532 U.S. 268, 271 (2001)).

An adverse action is one that would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (internal quotation marks and citation omitted). In determining whether there is a causal link, courts may consider "'a broad array of evidence'" including "intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus." LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 232 (3d Cir. 2007) (citing Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279-81, 284 (3d Cir. 2000)). "Unusually suggestive" temporal proximity between the protected activity and the adverse action may be alone sufficient to create an inference of causality and defeat summary judgment. Id. "Absent temporal proximity, 'circumstantial evidence of a pattern of antagonism following the protected

---

behavior collectively, no reasonable jury would find those isolated statements or actions were severe or pervasive.

11

conduct'" or "the proffered evidence, looked at as a whole" may raise an inference of discrimination. Bailey v. Commerce Nat'l Ins. Serv., Inc., 267 F. App'x 167, 170 (3d Cir. 2008) (quoting Kachmar v. SunGuard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1997)).

"Once a plaintiff establishes a prima facie case, the burden shifts to the employer to advance a legitimate non-retaliatory reason for its conduct. If an employer advances such a reason, a plaintiff then must show that the proffered reason was a pretext for retaliation." Estate of Oliva ex rel. McHugh v. New Jersey, 604 F.3d 788, 798 (3d Cir. 2010). A plaintiff must show that the explanation was false, or that the reason for the adverse action was retaliation. Marra v. Phila. Hous. Auth., 497 F.3d 286, 300-01 (3d Cir. 2007) (citing Moore, 461 F.3d at 342). "To survive a motion for summary judgment in the employer's favor, a plaintiff must produce some evidence from which a jury could reasonably reach these conclusions." Moore, 461 F.3d at 342 (citing Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)).

1. Sterner's Retaliation Claim

Berks argues Sterner did not engage in protected activity because his HR complaint was not made in good faith and a reasonable person would not have thought that the alleged sexual harassment violated Title VII. Berks' Br. at 14. It also contends that Sterner failed to allege adverse actions, a causal connection, or pretext. Id. at 15-25.

Sterner engaged in protected activity by making a complaint to HR and filing an EEOC charge based on retaliation. See Moore, 461 F.3d at 341. Although Sterner did not complain until July 2010, there is no evidence his complaints were made in bad faith. Construing the facts in the light most favorable to Sterner, there is sufficient evidence for a reasonable person in Sterner's position to believe Graffius' conduct violated Title VII's bar on sexual harassment.

See id. at 344; see also id. ("a victim of retaliation 'need not prove the merits of the underlying discrimination complaint' in order to seek redress." (citation omitted)).

Sterner also has alleged numerous adverse actions, such as changes to his job duties, an increase to his workload, removal from access to Graffius' calendar, relocation from a private office to a cubical, Graffius calling him someone's "butt-buddy," requiring him to sign in and out each day, the cessation of "flex" scheduling, and mandated lunch period. See Sterner's Dep. at 254-57, 268-69, 324, 335, 341, 352-68. These actions may have dissuaded a reasonable person from supporting a charge of discrimination.

Berks argues Sterner lacks a causal temporal link between his July 2010 HR complaint, his December 2010 EEOC filing, and his August 15, 2011 termination. Berks' Br. at 22. Even if this timing is not unusually suggestive, Sterner has asserted ongoing antagonism and other circumstantial evidence following his HR and EEOC complaints. LeBoon, 503 F.3d at 232; Bailey, 267 F. App'x at 170. Soon after Sterner followed up with HR about his complaints, there was a meeting concerning his job performance. Sterner's Dep. at 370-71. There also were several changes made within Sterner's auditing department. Id. at 354-59, 371-72. In addition, Graffius publically disclosed Sterner's complaints to HR. Pls.' DEF 956, 962. A rational fact finder could find a causal relationship between Sterner's complaints, the ongoing adverse actions to Sterner at work, and Sterner's termination. Sterner has demonstrated a prima facie case of retaliation.

Berks nevertheless claims Sterner was assigned additional work and his work duties were changed because he was one of only two certified public accountants on staff, and he was temporarily assigned accounting duties to assist with projects. Berks' Br. at 22. It claims that requiring Sterner to work harder to improve his performance was not adverse, specifically

because he was not required to work more than other employees. Id. Berks also asserts that Sterner's scheduling complaint affected all auditing employees, and Sterner admitted that the changes were made to conform the practice in the auditing and accounting departments. Id. at 19, 22-23 (citing Sterner's Dep. at 357, 360, 364). It also argues that it fired Sterner only because he admitted to asking a detective to borrow his gun to shoot a co-worker. Id. at 23.

Because Berks has articulated several non-discriminatory reasons for its conduct, to survive summary judgment, Sterner must establish pretext. See Marra, 497 F.3d at 2000. Sterner claims that Lumis relayed an inconsistent story about Sterner and Austin's conversation, Berks conducted an inadequate investigation of Lumis' complaint, the allegations were exaggerated, Graffius' communications with other employees demonstrated that she wanted to fire Sterner, and other employees were treated differently with regard to Graffius' "unwritten zero tolerance policy." Pls.' Br. at 13-15. Sterner also contends that everyone who heard his joke first-hand knew it was a joke and not a threat. Id. at 14. A reasonable jury may infer that Berks' reasons were a pretext for retaliation. Thus, I deny Berks' motion for summary judgment on Sterner's retaliation claim.

### 2. Austin's Retaliation Claim

Berks also argues that Austin's retaliation claim fails because he did not engage in protected activity. Berks' Br. at 26-28. Austin claims he was terminated because of his friendship with Sterner and Simpson, and because they all opposed Graffius' harassment and retaliation. Pls.' Br. at 13.

A plaintiff may sue for retaliation if he is in the "zone of interest" that the statutory provision was designed to protect. Thompson v. N. Amer. Stainless, 131 S. Ct. 863, 870 (2011). There is no "fixed class of relationships for which third-party reprisals are unlawful . . . .

expect[ing] that firing a close family member will almost always" fall within the zone of interest and "inflicting a milder reprisal on a mere acquaintance will almost never do so[.]" Id. at 868. "'[T]he significance of any given act of retaliation will often depend upon the particular circumstances.'" Id. (internal quotation mark and citation omitted).

Considering the spectrum between close family member and mere acquaintance, Austin's friendship with Sterner and/or Simpson fits within the zone of interest protected by Title VII. See Crawford v. George & Lynch, Inc., No. 10-949, 2012 WL 2674546, at *3 (D. Del. July 5, 2012), R&R adopted, No. 10-CV-949, 2012 WL 6087488 (D. Del. Dec. 6, 2012) ("Thus, a reprisal against another employee, who is a relative or close friend of the subject employee alleging the employment violation, may support a charge of retaliation under Title VII."); Ali v. D.C. Gov't, 810 F. Supp. 2d 78, 90 (D.D.C. 2011) ("Common sense suggests, and . . . Thompson support[s] the conclusion that, a reasonable worker would be deterred from pursuing a discrimination complaint by a credible threat to fire a close friend."); Cooper v. City of N. Myrtle Beach, 4:10-CV-1676, 2012 WL 1283498, at *7 (D.S.C. Jan. 25, 2012), R&R adopted, 4:10-CV-01676, 2012 WL 1283004, at *7 (D.S.C. Apr. 16, 2012) ("The evidence in the record indicates that Plaintiff and Johnson are friends. . . . the circumstances presented here fall somewhere between the 'firing of a close family member' and 'a milder reprisal on a mere acquaintance.'"). The jury must determine whether Austin proved retaliation based on his friendship with Sterner and/or Simpson.[10]

---

[10] The Third Circuit Model Jury Instructions state that "it seems likely that it is for the jury to determine whether, under the circumstances, retaliation against the third party might well dissuade a reasonable worker from engaging in protected activity. By contrast, it may be for the judge rather than the jury to determine whether the third party falls within the zone of interests protected by Title VII." Model Civ. Jury Instr. 3d Cir. 5.1.7 (2011).

Berks further argues there is no causal connection between Sterner's December 2010 EEOC complaint and Austin's August 5, 2011 termination. Berks' Br. at 30. Although it is unclear when Austin complained to HR about his coworkers, duties, or deadlines, there is sufficient evidence for a reasonable jury to infer retaliatory animus or ongoing antagonism despite the eight-month gap. Simpson left her Berks employment in January 2011. Simpson's Dep. at 263. Austin also cites emails between Graffius and other management, including: (1) an April 4, 2011 email in which Graffius stated that Austin was going through major personality changes since Simpson left Berks, that Austin, Sterner, and Simpson had had lunch together every day in the conference room, Pls.' DEF 1174; and (2) a May 17, 2011 email where Graffius wrote, "[Austin] is going to sue me anyway . . . . We have temp to perm ready to come in. [Austin's] 'at will' and my will has come to an end," Pls.' DEF 1196. Looking at these events as a whole, Austin has presented sufficient evidence to support an inference of retaliation at trial.

Berks argues that it terminated Austin because he threatened to use a firearm at work and violated his Last Chance Agreement, constituting cause for termination, a legitimate, non-retaliatory business decision. Berks' Br. at 31. Austin, like Sterner, argues Graffius inconsistently applied the "zero tolerance policy." Pls.' Br. at 13-15. He claims three other Berks employees joked about putting pins in and burning a Voodoo doll of a female vender and they were disciplined differently than Austin or Sterner. Pls.' Br. at 15; see Pls.' Ex. A, Battinger's Dep. at 520-28. Austin also claims that his joke about the copier repairmen mirrored the exaggerated accusations against Sterner. Id. at 15. Construing the facts in a light most favorable to Austin, a reasonable fact finder could disbelieve Berks' reasons for termination. Accordingly, Berks' motion for summary judgment on Austin's retaliation claim is denied.

C.  <u>Sterner's and Austin's Intentional Infliction of Emotional Distress Claims</u>

Finally, Berks contends that Sterner and Austin failed to submit medical evidence or an expert report to substantiate their intentional infliction of emotional distress claims, as required by Pennsylvania law.  Berks' Br. at 26-28.  I agree.

In addition to establishing the elements of a claim, a plaintiff must present expert testimony that he is suffering from severe emotional distress.  <u>See</u> <u>Kazatsky v. King David Mem'l Park, Inc.</u>, 527 A.2d 988, 995 (Pa. 1987) ("if section 46 of the Restatement is to be accepted in [Pennsylvania], at the very least, existence of the alleged emotional distress must be supported by competent medical evidence"); <u>Warner v. Montgomery Twp.</u>, No. 01-3309, 2002 WL 1623774, at *9 (E.D. Pa. July 22, 2002) ("In order to recover for intentional infliction of emotional distress in Pennsylvania, Warner is required to support his claim with competent medical evidence, in the form of expert medical evidence." (citation omitted)); <u>see</u> <u>also</u> <u>Hoy v. Angelone</u>, 691 A.2d 476, 610 (Pa. Super. Ct. 1996) (listing elements).

Sterner and Austin failed to produce competent medical testimony and concede that they have no expert reports.  Pls.' Br. at 3; <u>see</u> <u>Tuman v. Genesis Assocs.</u>, 935 F. Supp. 1375, 1393 n.20 (E.D. Pa. 1996) ("Once Defendants established that there was no expert medical confirmation of Plaintiffs' alleged injuries in the record, it became Plaintiffs' burden to produce that expert medical evidence to defeat the motion for summary judgment on this claim.").  Berks' motion for summary judgment as to the intentional infliction of emotional distress claims is granted.